**HARRINGTON et al. v. COBB et al.**

No. 13599.

Court of Civil Appeals of Texas. Dallas.

Dec. 22, 1944.

Rehearing Denied Jan. 19, 1945.

Culbertson, Morgan, Christopher & Bailey, of Fort Worth, for appellants.

Grover Sellers, Atty. Gen., and George P. Blackburn and C. K. Richards, Asst. Attys. Gen., for appellees.

LOONEY, Justice.

Harrington and Ramp, the appellants, brought this action under the Uniform De-

134

claratory Judgments Act (Acts 1943, 48th Leg., p. 265, ch. 164, Vernon's Ann.Civ.St. art. 2524—1) against George H. Sheppard, State Comptroller, and his deputy, G. C. Cobb, seeking a judgment declaring the rights of the parties under Article 7066b (a), V.A.C.S., that levies an occupation tax of 2.2 per cent of the gross receipts of "motor carriers", as defined in Art. 911b, V.A.C.S. Appellants alleged that they did not pursue the occupation of "motor carrier" or "contract carrier", as defined in the statute, but were engaged exclusively in the business of leasing and hiring motor trucks or equipment to those who were thus engaged; alleging further that, notwithstanding these facts, Comptroller Sheppard, through his deputy Cobb, demanded of appellants that they file quarterly reports and pay to the State Treasurer an occupation tax equal to 2.2 per cent of their gross receipts, required by statute of motor carriers and contract carriers; that in making such demand, appellees acted unlawfully, outside legal authority, same being a trespass upon the civil and property rights of appellants; also alleged that the taxing statute is void because in violation of Sec. 1, Art. 8, of the Constitution, Vernon's Ann.St.; wherefore, they sought a judgment declaring their rights and status under the statutes, i. e., whether under the facts they were amenable to the provisions of the statute and compelled to pay said tax.

The Attorney General of the State, for himself as amicus curiæ and on behalf of the appellees, filed a plea to the jurisdiction or in abatement, contending that in essence the suit was against the State, prosecuted without its consent. On hearing, the court sustained the plea, dismissed the suit, and in its order, among other things, recited that the suit was against the State, prosecuted without its consent; that having heard and considered the evidence "adduced by the stipulation of facts on file herein, is of the opinion that this court is without jurisdiction of either the parties or the subject matter of this action for the reasons that: Articles 7066b(a) as amended, 7105, as amended, and 911b, as amended, * * * are constitutional, that plaintiffs herein are 'motor carriers' or 'common carrier motor carriers', within the terms and provisions of said articles and each of them, and that said statutes and each of them are applicable to, and by the terms of said statutes construed in con-

nection with each other, the plaintiffs herein are maintaining or attempting to maintain an action against the State of Texas in its sovereign capacity under the provisions of Article 2524—1, V.A.C.S. without the consent of the State of Texas to be sued under the provisions of said Uniform Declaratory Judgment Act," etc. Appellants excepted to the action of the court, gave notice of and perfected this appeal.

The case was submitted on agreed facts in three installments, bound together, styled "Stipulation of Facts"—part of the record. Seemingly the case is one of first impression, as touching liability for the occupation tax imposed on motor carriers, of one engaged as are the appellants, in the business of leasing or hiring to common carrier motor carriers, motor trucks, trailers and equipment to be used by them in transporting for hire, freight over the public highways and thoroughfares of the State; also is of first impression on the right of persons engaged as are appellants, to maintain an action under the Uniform Declaratory Judgments Act against the Comptroller of the State for judgment declaring the rights or status of the parties under the statutes, and have same construed and their validity, as applied to appellants, determined; so, in stating our conclusion, we deemed it appropriate to draw quite liberally from the stipulation of facts.

As before stated, the stipulation of facts is in three installments, the first dated August 1, 1943. Paragraph III thereof stipulated that plaintiffs (appellants here) owned certain motor trucks, trailers and equipment for the transportation of freight over the highways and public thoroughfares of the State; that they were "engaged in the business of leasing these chattels to common carrier motor carriers" as defined in Art. 911b, § 1(g), Vernon's C. S.; paragraph IV stipulated that such leases were made to common carrier motor carriers "holding certificates of convenience and necessity", issued by the Railroad Commission of Texas under Art. 911b, § 3, and that all leases are on a standard form approved for such purpose by the Railroad Commission, each lease providing for a flat compensation of 15 cents per mile for the use of the vehicle operated under the terms of the lease. In paragraph V appellants agreed to furnish at their own expense drivers to operate the leased equipment, who remained employees of appel-

lants, but subject to the direction of the lessee for the limited purpose of insuring proper carriage and delivery of the cargo; appellants also agreed to furnish compensation insurance, pay social security, old age benefits and unemployment compensation taxes for their drivers; also all costs and expenses of operation, maintenance and upkeep of the equipment; lessee assumed no liability for loss or damage to, or destruction of the equipment while being operated by appellants' drivers, and they agreed to indemnify lessees against losses resulting from injury to, or death of drivers, and against loss or damage resulting from their negligence, incompetency or dishonesty. Installment dated August 10, 1944 (para. II) stipulated that appellants' sole and only relations to or connection with the movement of freight, were with motor carriers holding certificates of convenience and necessity; that said relations consisted solely in leasing trucks and equipment under the lease contract, shown as "Exhibit A"; they issued no bills of lading, delivery receipts, freight or express bills, manifests, or any other shipping document of any kind; their sole business transaction consisted in carrying out the lease contract according to its terms; (para. IV) they solicited no freight for movement; (para. V) collected no freight charges; (para. VI) nor did they hold themselves out to the public as common carrier motor carriers, but simply held themselves out as being able, ready and willing to enter into lease contracts (Exhibit A) with any motor carrier holding a certificate or permit issued by the Railroad Commission,—"but nothing more than that". Paragraph VII recites that when a lease contract was entered into, appellants caused the vehicle leased and its driver to be delivered at a place designated by the lessee, and from that time on to the expiration of the lease contract, both vehicle and driver were subject to the control and direction of the lessee; (para. VIII) before sending the vehicle out on the highway, lessee attached thereto a commission license plate; (para. IX) appellants received no compensation, except 15 cents per mile as heretofore stated; (para. X) lessee loaded and unloaded the trucks; (para. XI) solicited from the public freight for shipment; (para. XII) issued to the shipper a bill of lading in its own name, made its own deliveries; (para. XIII) collected the freight charges prescribed by

the Railroad Commission; and in paragraph 3 of the lease contract, "Lessee agrees to furnish, in amounts not less than standard limits, public liability and property damage and cargo insurance for the protection of the public." Appellants assumed no responsibility whatever for the freight. The above is a liberal statement of the provisions of the lease contract, and the relation of the parties created thereby.

Appellants concede that, if the facts show they were operating as a motor carrier, as defined in Art. 911b, Vernon's Ann. Civ.St., the Comptroller and his deputy acted within lawful authority in demanding compliance with the provisions of the taxing statute, Art. 7066b(a), Vernon's Ann.Civ.St.; hence the suit would be against the State; but that if appellants were not thus engaged, the officials acted without lawful authority in making the demand; hence, under a well-recognized exception to the general rule requiring the State's permission to be sued, the suit would not be against the State. However, appellants' overall contention is that, in any event, whether the suit is or is not considered against the State, it was authorized by and is maintainable under Art. 2524—1, Vernon's Ann.Civ.St. (Uniform Declaratory Judgments Act), in order to have determined the construction and validity of the several statutes involved, and to obtain from the court a declaration of appellant's rights, status and legal relations thereunder.

The pertinent facts have heretofore been set out in extenso; the controlling statutes are these: Art. 911b, Sec. 1, subd. (g), defines motor carriers in the following language: "The term 'motor carrier' means any * * * co-partnership * * * owning, controlling, managing, operating or causing to be operated any motor-propelled vehicle used in transporting property for compensation or hire over any public highway in this State, where in the course of such transportation a highway between two or more incorporated cities, towns or villages is traversed; * * *." The taxing statute brought under review is Art. 7066b, Vernon's C.S.; its applicable provisions read: "Each * * * 'motor carrier' or 'contract carrier' * * * shall make quarterly on the first day of January, April, July, and October of each year, a report to the Comptroller, under oath, * * * showing the gross amount received from intrastate business done within this State

in the payment of charges for transporting * * * any freight or commodity for hire, or from other sources of revenue received from intrastate business within this State during the quarter next preceding. Said * * * partnership * * * at the time of making said report, shall pay to the State Treasurer an occupation tax for the quarter beginning on said date equal to two and two tenths (2.2) per cent of said gross receipts, as shown by said report. Provided, however, carriers of persons or property who are required to pay an intangible assets tax under the laws of this State, are hereby exempted from the provisions of this Article of this Act."

█ Contrary to the earnest insistence of the Attorney General in the able brief and arguments, both oral and written, presented to the court, we fail to find in the agreed facts any support for the contention that appellants were engaged in the occupation of "operating or causing to be operated any motor-propelled vehicle used in transporting property for compensation or hire" over public highways in this State; to the contrary, we think the facts support and are consistent with paragraph 3 (p. 2) of the Stipulation of Facts, to the effect that appellants were owners of certain motor trucks and equipment and were "engaged in the business of leasing these said chattels to common carrier motor carriers", as defined in Art. 911b, Vernon's Ann.Civ.St.; and the facts, in our opinion, are inconsistent with any other conclusion. Seemingly the Attorney General argues that, although appellants do not receive from intrastate business charges for transporting freight, yet, as they are paid from other sources of revenue derived from intrastate business,—in that they are paid by the lessee motor carrier 15 cents per mile for the use of the leased vehicles —they are amenable to the taxing statute (Art. 7066b). To this contention we cannot assent. We attach no significance whatever to the fact that the lessor is compensated for the use of his motor vehicles on a mileage basis, rather than so much per hour or per day; for, in either event, the amount paid would simply be an item of expense deducted by the leasing carrier from his gross receipts from the traffic.

██ The contention is also made that, as it nowhere appears from the record that appellants pay either a gross receipts tax, an intangible tax, or an ad valorem tax, they pay no taxes whatever, and plainly are attempting, by a simulated business transaction under the guise of a leasing contract, to evade the payment of any tax. Whether appellants are required to pay a gross receipts tax as a motor carrier, as insisted, is the very question being litigated here; and, nothing appearing to the contrary, we think it must be presumed that they pay all other taxes for which they are legally liable. But whether they should pay an occupation tax based upon their gross receipts from the business which admittedly they are pursuing, i. e., the business of leasing to common carrier motor carriers motor trucks and trailers, poses a legislative and not a judicial question; and until the legislature imposes an occupation tax upon the pursuant of such business, appellants cannot be held in default in that respect.

█ The facts disclose that appellants dealt exclusively with motor carriers holding certificates of convenience and necessity issued by the Railroad Commission and operated under its jurisdiction, and that all lease contracts consummated were on a standard form approved by the Commission for such use; these undisputed facts, in connection with others equally explicit revealed by the stipulations, leave no room for an implication that the business arrangement between appellants and the lessee motor carriers was simulated, or that the lease contracts were used as a mere subterfuge to evade payment of taxes; as a matter of fact, we do not think any tax was evaded by this business arrangement, or that the State sustained any loss whatever, as it must be presumed the State collected a gross receipts tax of 2.2 per cent under the provisions of Art. 7066b (a), Vernon's Ann.Civ.St., upon every pound of freight hauled over the highways in the trucks, trailers or equipment leased from the appellants; or else, under the provisions of Art. 7105, Vernon's Ann.Civ. St., collected an ad valorem tax on the value of the intangible assets of the motor carriers, based in part upon their "gross receipts"; and if, in addition, appellants are required to pay 2.2 per cent of the gross receipts for the hire of their equipment used by the motor carriers, the result, in our opinion, would be double taxation.

The stipulations show that, under the arrangement, appellants were not required to engage in any of the usual and customary activities of a common carrier;

whereas the lessee carrier was required to engage in all these, solicited from the public and received freight for transportation, loaded and unloaded the leased trucks, which, with the drivers, were under the control and direction of the lessee for the purpose of insuring proper carriage and delivery of the cargo; all freight transported in these leased vehicles moved on bills of lading issued by the lessee; the lessor assumed no responsibility whatever for the transportation, delivery of the freight, or collection of the freight charges.

No case from our courts, directly in point, has been brought to our attention—the nearest in point is Reavley v. State, 124 Tex.Cr.R. 528, 63 S.W.2d 709, where, under the facts there involved, the Court of Criminal Appeals held that the appellant was a contract carrier within the meaning of the statute, and was using the lease contract involved for the purpose of evading the requirements of motor carrier laws. Obviously this decision was correct, in that, under the facts, Reavley was the person who used the highways for traffic, and was the only one against whom the law could have been enforced. We have examined the other cases cited, but do not think either is in point. Some are from Federal Courts, controlled by Federal statutes; others are from different State courts, controlled by the statutes peculiar to the particular state. It would lengthen this opinion to no purpose to comment on or attempt to distinguish these cases.

Taxing statutes, in our opinion, should not be so construed as to unreasonably extend their provisions beyond the plain import of the language employed, as taxes may not be imposed by implication. This rule was aptly stated by Judge Smith of the San Antonio Court of Civil Appeals in State v. San Patricio Canning Co., Tex. Civ.App., 17 S.W.2d 160, 162, 163; he said: "The rule is that the courts may not extend or give special significance or an unnecessary or peculiar or strained construction to such plain terms as those employed in order to subject a particular commodity to a tax imposed by the government. The rule is, rather, that in the interpretation of statutes imposing taxes their provisions will not be extended by implication beyond the plain import of the language used, nor will their operation be enlarged to apply to subjects not specifically included therein, and 'in case of doubt they are construed most strongly

against the government, and in favor of the citizen.' 25 R.C.L. pp. 1092, 1093; 36 Cyc. p. 1189; 26 Am. & Eng.Encyc.Law (2d Ed.) 669; Gould v. Gould, 245 U.S. 151, 38 S.Ct. 53, 62 L.Ed. 211; Underwood v. [Childress Independent] School Dist., Tex.Civ.App., 149 S.W. 773."

The occupation tax under consideration was levied upon the business of operating, or causing to be operated, motor-propelled vehicles for transporting property, for hire, over the public highways, and whether or not the motor vehicles used in the business are owned or leased by the operator is of no particular significance. This idea was expressed by the Supreme Court in the early case of Pullman Palace Car Co. v. State, 64 Tex. 274–280, 53 Am.Rep. 758. The suit was by the Attorney General to collect an occupation tax; in course of the opinion, Judge Stayton said: "The tax authorized by the act is essentially an occupation tax, in which the ownership of the cars is of no importance, except as it may fix the person on whom the liability is imposed."

As heretofore shown, appellants simply owned, equipped with drivers, ready for service, certain motor vehicles, not operated by the owners, but by lessees who were regularly qualified motor carriers acting under and by virtue of the applicable regulatory and taxing statutes. In Pullman Palace Car Co. v. Matthews, 74 Tex. 654, 12 S.W. 744, 15 Am.St.Rep. 873, the Supreme Court announced the doctrine that "A sleeping car company which hires a sleeping car to a railway company, reserving only the right to collect fares for the use of berths, keeping its own servants on the car, though not liable as a common carrier, must yet use reasonable care to guard passengers from theft, * * *"; also see Pullman Palace Car Co. v. Pollock, 69 Tex. 120–123, 5 S.W. 814, 5 Am. St.Rep. 31. The comparatively recent case of Georgia Truck System Inc. v. Interstate Commerce Commission, 5 Cir., 123 F.2d 210, 212, arose under the Federal Motor Carrier Act, and was decided by the Circuit Court of Appeals on the facts; in the opinion, Judge Hutcheson commented freely upon the facts, reaching the conclusion that "The form of the renting or hiring" employed was but a subterfuge, and that in reality appellant was operating a transportation business. However, the court announced a rule, which in our opinion is applicable and controlling here; they said:

"We think it may not be doubted that if the evidence supports appellant's view that its business was confined to simply renting trucks for use by others, appellant would be right in its insistence that it was not engaged in transportation within the invoked act."

█ So we reach the conclusion, from the facts heretofore stated, that the appellants were not engaged either in controlling, managing, operating or causing to be operated motor-propelled vehicles, used in transporting property for compensation or hire, over the public highways of the State, within the meaning of the statutes. Vernon's Ann.Civ.St., Art. 911b and Vernon's Ann.Civ.St., Art. 7066b(a). To conclude otherwise, in our opinion, would be to ignore the plain import and meaning of the facts and reasonable inferences; furthermore, would be an impeachment of the judgment of the Railroad Commission that, with full knowledge, approved the lease contract and the business pursued thereunder as perfectly legitimate. Consequently, we conclude that, in their attempt to force appellants to file quarterly reports and pay the State Treasurer the occupation tax levied by civil statute Art. 7066b(a), Vernon's, the Comptroller and his deputy acted without legal authority; hence, under a well-established exception to the general rule, the suit is not to be considered as against the State but against the officials as individuals. The exception was announced very clearly by the San Antonio Court of Civil Appeals in the case of Terrell v. Middleton, Tex.Civ.App., 187 S.W. 367, 369, writ ref., 108 Tex. 14, 191 S.W. 1138. In the course of a lengthy opinion, Chief Judge Fly said: "When a state officer acts without legal authority, he is not acting for or in the interest of the state, and a suit against him is not a suit against the state. In deciding who are parties to the suit the court will not look beyond the record. Making a state officer a party does not make the state a party, although her law may have prompted his action, and the state may stand behind as a real party in interest." Also see Imperial Sugar Co. v. Cabell, Tex.Civ.App., 179 S.W. 83; Mosheim v. Rollins, Tex.Civ.App., 79 S.W.2d 672.

█ But we are of opinion that whether the action is considered a suit against the State or not, is wholly immaterial, in that we think it was authorized by and is maintainable under the comprehensive provisions of the Uniform Declaratory Judgments Act, Art. 2524—1, Vernon's Civ.St., 1943 Supp. Sec. 2 of the Act provides that any person interested under, or whose rights, status or other legal relations are affected by a statute, municipal ordinance, contract or franchise, may have determined any question of construction or validity arising thereunder, and obtain a declaration of rights, status or other legal relations thereunder. No action or proceeding is excepted from the operation of these comprehensive provisions; but it seems, anticipating that the act might be restricted in meaning and narrowed in application, the Legislature provided, in Section 5, that the enumeration in Secs. 2, 3, and 4 of the Act "does not limit or restrict the exercise of the general powers conferred in Section 1, in any proceeding where declaratory relief is sought, in which a judgment or decree will terminate the controversy or remove an uncertainty." Sec. 11 provides that where declaratory relief is sought "all persons shall be made parties who have or claim any interest which would be affected by the declaration * * *." Sec. 12 declares the Act to be remedial, its purpose being to settle and afford relief from uncertainty and insecurity with respect to rights, status and other legal relations; "and is to be liberally construed and administered", and Sec. 13 provides that: "The word 'person,' wherever used in this Act, shall be construed to mean any person, partnership, joint stock company, unincorporated association or society, or municipal or other corporation of any character whatsoever." So we conclude that even if the action be considered against the State, nevertheless it was authorized, and the Comptroller, charged with the duty of protecting the interest of the State under the statutes called in question, was an interested and proper party within the meaning of Sec. 11 of the Act.

█ However, the Attorney General insists that Art. 7057b, Vernon's Ann.Civ.St. (the suspense statute that provides for suit to recover taxes paid under protest), furnishes an adequate remedy and is exclusive. We do not think so. Sec. 7, Art. 7057b, reads: "The provisions of this law shall be cumulative of all laws relating to the payments of taxes or fees of undetermined status and for the holding thereof in the suspense account fund of the State Treasurer. Acts 1933, 43rd Leg., p. 637,

ch. 214." As heretofore shown, there is nothing in the Declaratory Judgments Act that restricts its use to any particular class of actions or proceedings, and, although a subsequent enactment, we do not think it was intended to supplant the remedy afforded by Art. 7057b; but think these statutes should be construed as cumulative of each other. The questions raised by the Attorney General, in effect, are the same that were urged on behalf of the Federal Government in Penn v. Glenn, Collector of Internal Revenue, in D.C., 10 F.Supp. 483, 486, dismissed appeal, 6 Cir., 84 F.2d 1001. This was an action under the Federal Declaratory Judgments Act, 28 U.S.C.A. § 400, to determine the validity of the tax imposed by the Tobacco Control Act, 7 U.S.C.A. §§ 751–766, and, as in the instant case, the defendants challenged the authority of the court to grant the relief sought because the proceeding, in effect, was a suit against the Government, and could not be maintained in the absence of its consent, and, further, that the method of recovering taxes paid as provided by Sec. 3226, Rev.St., as amended, Sec. 3772, Title 26, U.S.C.A. Int.Rev.Code, was exclusive. These contentions were both denied by the court, and in the course of a lengthy opinion the court said: "As applied to tax statutes, this proceeding is merely a convenient means of settling the law before payment of the tax, or after payment of the tax and before the institution of a suit for a refund * * *." After the decision in Penn v. Glenn, the Federal statute was amended, prohibiting Federal courts from entertaining declaratory judgments actions with respect to Federal taxes. See Murphy v. Graves, Col. of Internal Revenue, 6 Cir., 120 F.2d 243. As the Declaratory Judgments Act of this State contains no such exception as was introduced by the amendment to the Federal Act, in fact contains no exception whatever, the pertinency of the rule announced in Penn v. Glenn is quite apparent. The same rule was announced by the Supreme Court of Tennessee in Goetz v. Smith, 152 Tenn. 451, 278 S.W. 417, 418. This suit was brought under the Declaratory Judgments Act of the State of Tennessee, the defendants being Knox County, the Trustees, County Judge, Superintendent of Roads of Knox County, the Attorney General, and the Board of Highway Commissioners created for Knox County under an act providing for an efficient system of roads and for the levying of taxes to raise the necessary funds for such purpose. The Attorney General raised the question as to whether the defendants were interested parties within the meaning of the act. In response to this question, the Supreme Court, in an opinion by Chief Justice Green, said: "Some doubt is expressed by the Attorney General as to the propriety of a declaration herein. As the case was finally shaped and submitted to the court below, however, we think an expression from the court was required; that is to say, there were parties before the court having a real interest to deny, and parties before the court having a real interest to affirm, the integrity as a whole of chapter 343 of the Private Acts of 1925. Hodges v. Hamblen County, 152 Tenn. 390, 277 S.W. 900; Miller v. Miller, 149 Tenn. 463, 261 S.W. 965."

On behalf of appellees, the Attorney General calls attention to certain cases from other States that announced a contrary doctrine, i. e., that an action under the Declaratory Judgments Act could not be maintained in disregard of the sovereign immunity from suit without consent. Obviously, the Acts of other States are not uniform in all respects, which, no doubt, accounts for these diverse holdings. This, in our opinion, could reasonably account for the decision in Hoyt v. Board of Civil Service Commissioners, 21 Cal.2d 399, 132 P.2d 804, under the California Act, cited by the Attorney General. As heretofore shown, the Declaratory Act of this State authorizes an action by any person "affected by a Statute"; whereas, the California statute contains no similar provision (See Sec. 1060, Calif.Code Civ. Proc.) We do not deem it necessary to lengthen this opinion by a discussion of the other cases cited.

As heretofore stated, the trial court found that appellants were "motor carriers" or "common carrier motor carriers", as defined in Art. 911b, Vernon's Ann.Civ.St., and, as such, liable for the payment of the occupation tax imposed by Art. 7066b(a), Vernon's Ann.Civ.St.; that the Comptroller of the State was acting within the scope of his authority in attempting to enforce the collection of the tax from appellants; and that the suit, although against the Comptroller, in legal effect was against the State, was being prosecuted without its consent, and was not authorized by any provision of the Declaratory Judgments Act; hence the court

sustained the plea in abatement and dismissed the cause. In view of what has heretofore been said, we think the court erred in the foregoing findings and conclusions; and, as the facts are certain, having been agreed to, and the case fully developed, we shall render such judgment as in our opinion should have been rendered by the court below; i. e., in favor of the appellants, declaring their status under the statutes involved, to the effect that, under the facts as stipulated, they neither pursue the occupation of "motor carrier" or "common carrier motor carrier", nor are they liable as such for payment of the occupation tax imposed by Art. 7066b(a).

It follows that, in our opinion, the judgment of the court below should be reversed and here rendered for appellants as above indicated, and it is so ordered.